## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JUSTIN EUGENE EVANS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00255** |
| | ) | **Judge Aleta A. Trauger** |
| **NASHVILLE FILM INSTITUTE, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### MEMORANDUM

Before the court is defendant Nashville Film Institute, LLC's Motion for Summary Judgment. (Doc. No. 14.) For the reasons set forth herein, the motion will be granted in part and denied in part.

## I.    FACTS

Plaintiff Justin Evans was employed by the Nashville Film Institute, LLC ("NFI") for a total of eight days in 2019 before he was terminated. Evans's lawsuit asserts claims for disability discrimination in violation of both the Tennessee Disability Act ("TDA") and the Americans with Disabilities Act ("ADA"). The ADA applies only to employers that have "15 or more employees for each working day in each of twenty or more calendar weeks in either the year in which the alleged discrimination occurred or the preceding year." 42 U.S.C. § 12111(5)(A)

Prema Thiagarajah is NFI's Campus Director. Thiagarajah attests, without providing any additional detail or supporting documentation, that NFI had thirteen employees "during the relevant time period." (Doc. No. 17-1, Thiagarajah Decl. ¶ 4.) The plaintiff disputes that fact and provides a list of more than fifteen employees who worked at NFI during his tenure. (Doc. No. 21-

1, Evans Decl. ¶ 34.) He also submits the Declaration of Candace Lafayette, NFI's office manager in August 2019. Lafayette states that NFI "likely . . . had 15 employees or slightly over" during her employment, and she provides a list of eighteen people employed by NFI when she was office manager. (Doc. No. 22-1, Lafayette Decl. ¶ 6.) According to Michael Tabb, NFI's program director at the time, NFI "employed individuals [who] were not necessarily properly classified," as they were required to sign contracts classifying them as independent contractors but, at the same time, had to clock in and out with a finger scanner, were directed when and how to perform their jobs, and were paid on an hourly or salary basis. (Doc. No. 23-1, Tabb Decl. ¶¶ 2–3.)

In August 2019, Michael Tabb recommended Justin Evans to Thiagarajah for NFI's vacant Cinematography Instructor position. The parties agree that Thiagarajah had final say on hiring decisions. From there, the parties' versions of events diverge wildly. According to Thiagarajah, she agreed that Evans could "audition" for the Cinematography Instructor position and interview for the also-vacant Equipment Room Manager position, but, before either of these events occurred, Tabb "surprised" her by informing her that Evans had moved to Nashville and was ready to start work. (Thiagarajah Decl. ¶¶ 6-7.) She claims that Evans was not promised a position prior to his arrival in Nashville and that Tabb was not authorized to offer him a job. (*Id.* ¶¶ 8–10.) She also claims that Evans was never actually hired as a Cinematography Instructor, because he "failed to audition for the position." (Thiagarajah Decl. ¶ 23.) She further alleges that he "did not complete the interview process for the potential position in the equipment room. (*Id.* ¶ 24.)

Evans denies that he was ever told of any type of audition requirement for the instructor position or of a probationary period for the equipment room position. (Evans Decl. ¶ 5.) He attaches to his Declaration email exchanges with Tabb showing that he was on the schedule to teach cinematography classes during the fall of 2019. (*See id.* ¶ 11 & Ex. B (Doc. No. 21-1, at 9–

11).) The evidence he presents also refutes the suggestion that he failed to undergo any additional interview process supposedly required for the Equipment Room Manager position. Specifically, according to the plaintiff, Tabb, as program director, was authorized to relay hiring and firing decisions. (Tabb Decl. ¶ 2.) After Tabb recommended Evans to Thiagarajah for the Cinematography Instructor position, Evans interviewed by telephone with both Tabb and Thiagarajah in mid-August for the instructor position. According to Tabb, Evans had more recognized experience than any other teacher or employee at NFI and was an award-winning "writer/director/cinematographer" working with "known talent." (Tabb Decl. ¶ 4.) During the interview, they discussed that Evans would need to move from Wisconsin to Nashville for the job, and Evans also disclosed to Tabb and Thiagarajah that he had Asperger's syndrome. (Evans Decl. ¶ 10.) Thiagarajah did not display any concern about Evans's condition at that time. They also discussed Evans's work with business partner Ruben Burgos on a new lighting system called Anthem One. Thiagarajah asked Evans to bring with him to Nashville several of the new lighting systems he had invented. (Evans Decl. ¶¶ 3, 4.)

According to the plaintiff, Thiagarajah notified Tabb after the interview that she wanted to hire Evans; she told him, "he's great" and that "he should come here and start by a specific date." (Tabb Decl. ¶ 5.) At that time, Thiagarajah did not mention anything about needing another interview. (*Id.*) Tabb relayed the offer to Evans, and Evans accepted. (*Id.*; Evans Decl. ¶ 5.) When Tabb told Thiagarajah that Evans had accepted the offer, she did not say anything then about another interview. (Tabb Decl. ¶ 5.) Only later, after Tabb had communicated again with Evans and Evans had told his family about the job, Thiagarajah "relay[ed] to [Tabb] that she intended to interview [Evans] again once he arrived." (*Id.*) Tabb conveyed this information to Evans but assured him he should still come, as Tabb believed the second interview was nothing more than a

formality. (*Id.*) Evans was asked to report to NFI by September 2, 2019. (*Id.* ¶ 6.)

According to Evans, the job originally offered to him, and the job he initially accepted, was the Cinematography Instructor position. Evans's business partner, Ruben Burgos, was actually offered the job of Equipment Room Manager. Burgos had planned to accept the offer but decided at the last minute that he did not want to move to Nashville. At some point, Evans agreed to take on both positions. (Evans Decl. ¶ 6.) It is not clear when that occurred, but, on August 20, 2019, Tabb introduced Evans via email to Candace Lafayette, NFI's office manager, as the new full-time Cinematography Instructor and Film Equipment Manager. (Evans Decl. ¶ 7; *see also* Doc. No. 21-1, at 7.) Lafayette emailed Evans the "New Employee Paperwork" for him to complete and return. Evans filled out this paperwork and returned most of it before moving to Tennessee. (Evans Decl. ¶ 8.)

It appears to be undisputed that Evans moved to Nashville and began working at NFI on September 2 or 3, 2019. He and Tabb, at least, understood that he would fill both roles. Evans and Tabb exchanged emails on September 3, 2019 about the class schedule for that fall and which classes Evans would be teaching. (Doc. No. 21-1, at 10.) Early on the morning of September 5, 2019, Thiagarajah sent Evans an email asking him to review a quote she had received for iMacs and suggesting that they "talk thoughts through about setting up computer lab." (Doc. No. 21-1, at 14.) Evans then met with Thiagarajah later the same day. At that meeting, according to Evans, he explained to her that he might need some "social grace" to accommodate his Asperger's syndrome, as he "tend[s] to have neutral facial expression" and "fail[s] to adhere to some social norms." (*Id.* ¶ 14.) For instance, he has an "inability to tell white lies to make someone feel better" and is "more direct" than others, because of his autism. (*Id.*) Evans alleges that it was during this meeting that Thiagarajah reconfirmed that he should fill the Equipment Room Manager position, in addition to

the Cinematography Instructor position. (*Id.* ¶ 14.) In the same conversation, Thiagarajah asked Evans to finalize his "bio" for NFI's website, which he emailed to her at 5:48 p.m. the same day. (*Id.* ¶ 14; *see also* Doc. No. 21-1, at 12.) He also sent a lengthy and thoughtful response, around 5:00 p.m., to Thiagarajah's email requesting his thoughts about the iMac quote, making numerous suggestions for saving money and improving student experience. (Doc. No. 21-1, at 13.)

Thiagarajah, however, claims that, during this first meeting, Evans told her he did not think the job was a good fit for him and was not going to work out. (Thiagarajah Decl. ¶ 15.) Evans denies ever making that statement. (Evans Decl. ¶ 23.) Thiagarajah also claims Evans told her he "did not want the Equipment Room Manager job" but would "like a chance to run the Equipment Room and report directly to [Thiagarajah]. He said that his request was motivated by the fact that he did not respect Mr. Tabb as a leader." (Thiagarajah Decl. ¶ 17.) Evans explains that his business partner was originally going to accept the job of Equipment Room Manager, and Evans initially was not interested in the role. (Evans Decl. ¶ 9.) However, by the time he moved to Nashville (as demonstrated by his email introduction to Candace Lafayette on August 20), he had agreed to take on both the Cinematography Instructor position and the Equipment Room Manager position. His understanding of the role was that it should report directly to Thiagarajah, and he made that recommendation, but he denies that he ever stated that he did not respect Tabb as a leader. (*Id.*)

Thiagarajah asked Evans to compose a report, in his capacity as Equipment Room Manager, regarding the changes needed in order to make the equipment room more functional and more productive and to save money. Evans produced a nine-page report pointing out areas of financial risk or loss and making numerous recommendations. He identified over $50,000 in potential savings for NFI. He attests that he was careful to critique the system he had been hired to improve rather than individuals. (Evans Decl. ¶ 18.)

In compiling this report, Evans reached out to several faculty members for input, including Matt Perkins, the program coordinator. (Evans Decl. ¶ 17.) During a conversation with Perkins, Perkins relayed to Evans a story involving his having "dealt with another autistic person," a student, earlier that day. Evans relayed to Perkins his "identification with Asperger's Syndrome." (*Id.* ¶ 19.) Perkins indicated that he could "handle" Evans, because he had dealt with a student with Asperger's syndrome.

At a subsequent meeting with Nick Alonzo and Matt Perkins about Evans's suggested changes to the equipment room, Evans contradicted something Perkins was saying, and Perkins "proceeded to yell at [Evans]," because Perkins felt that Evans had interrupted him while he was attempting to get a point across. (Evans Decl. ¶ 22.) Evans, recalling their earlier conversation, reminded Perkins that he had Asperger's syndrome, told Perkins that he was simply passionate about the topic and had not intended to upset or interrupt him, and asked Perkins to provide him the same "accommodation" he had given his students with Asperger's or autism. (*Id.* ¶ 22.) Perkins told him, "I don't have to give you any accommodations, you're an adult." (*Id.*)

The following day, Evans asked for a meeting with Thiagarajah and explained to her his interaction with Perkins and his belief that Perkins had discriminated against him and treated him differently and in a hostile manner simply because he was an adult with Asperger's, rather than a student. He told Thiagarajah he had not been intentionally rude but was simply focused on doing the job she had asked him to do. He also explained that he is sometimes "unable to pick up some social cues," which "sometimes provides for socially awkward situations," though he "tr[ies] very hard to use softening language as [his] natural speech can be blunt." (*Id.* ¶ 24.) Evans left the meeting believing it had gone fairly well, but he was fired shortly thereafter. (*Id.*) Several days after the meeting, based at least partly on his impression that Thiagarajah, Perkins, and Alonso

"ha[d] not spoken to [him]" since the heated conversation and his discussion about it with Thiagarajah, Evans sent an email to Tabb on September 9, 2019, detailing what happened during that conversation and expressing his fear that he would be fired pretextually because of his Asperger's. (*See* Doc. No. 21-1, at 17–18.)

Thiagarajah's version of events, of course, is quite different. She alleges that, during the few days following her initial meeting with Evans, Evans "engaged in heated disagreements with staff and instructors" concerning, in part, Evans's "assessment regarding NFI's curriculum and/or their respective duties." (Thiagarajah Decl. ¶ 19.) She claims that Evans "needlessly provoked disagreements with staff, instructors, and alumni—combatively yelling, insulting, and attacking others who disagreed" with him (*id.* ¶ 18), that he refused to let an alumnus take gear from the equipment room and was combative and verbally abusive with the alumnus and another staff member who intervened (*id.* ¶ 20), and that he "yelled at three different staff members (Micah Ellars, Matt Perkins, and Nick Alonzo), berating them with accusations about the quality of their curriculum or their abilities to do their jobs" (*id.* ¶ 20). For his part, Evans denies that he was engaged in any heated disagreement with anyone other than Perkins, in the conversation described above. He denies yelling or being combative during that conversation, though Perkins yelled, but Evans concedes that he himself "raise[d] [his] voice." (Evans Decl. ¶ 21.) He expressly denies "yelling" at either Micah Ellars or Nick Alonzo and denies ever refusing to allow an alumnus take gear from the equipment room. (*Id.* ¶¶ 25, 33.)

Thiagarajah claims that she was "shocked by the number and intensity of these incidents," which she alleges "created entirely unnecessary conflict, disrupted everyone's ability to do their work, and harmed NFI's small staff." (Thiagarajah Decl. ¶ 21.) Evans denies any basis for this

purported shock, as he was engaged in only one unpleasant conversation, which he discussed with Thiagarajah.

NFI alleges that the Equipment Room Manager position required a substantial amount of interaction with faculty, staff, and students. Evans purports to deny that statement on the basis that he was never provided a written or verbal description for the position, and he affirmatively avers that he successfully demonstrated his ability to complete the duties expected of him and was perfectly capable of engaging in appropriate interactions with faculty, staff, and students. (Evans Decl. ¶¶ 17, 37–38; *see also* Tabb Decl. ¶ 9.) However, he also submits and relies upon Tabb's Declaration, in which Tabb states that "[t]he equipment room manager position does require interaction with faculty, staff and students." (Tabb Decl. ¶ 9.) And Evans himself also admits that he had "a limited sampling" of what the job entailed, having held it for only eight days. (Doc. No. 20, at 17 (Resp. to Statement of Fact No. 26).)

The defendant avers that its Code of Conduct required staff to deal professionally with one another and to treat all individuals at NFI, employees or not, with dignity and respect. (Thiagarajah Decl. ¶ 26.) Evans agrees that the Code of Conduct as written required staff to deal professionally with one another and treat non-NFI employees with dignity and respect, but he denies that he violated any Code of Conduct and avers that he was penalized for performing the task assigned to him by Thiagarajah and "present[ing] [his] findings in a direct way." (*See* Tabb Decl. ¶ 10.) Tabb asserts that, during his six-month tenure at NFI, he witnessed "several other heated debates." (*Id.* ¶ 12.)

Thiagarajah claims that she determined that Evans's conduct violated NFI's Code of Conduct and other policies set out in NFI's Handbook—specifically, that his behavior violated the General Standards of Conduct, constituted "Unacceptable Behavior," and violated NFI's "No-

Harassment Policy." (Thiagarajah Decl. ¶ 27; *see also* Doc. Nos. 17-2, at 1 and 17-3, at 3.) She asserts that adherence to the rules and requirements of the Handbook was a condition of Evans's employment and, further, that she had an obligation to "maintain a workplace and classroom environment free of any form of harassment." (Thiagarajah Decl. ¶¶ 27–28.) She avers that she could not employ someone who "interfered with others' work," "disrespectfully criticized the school's curriculum," "verbally abused others," and "prevented alumni from utilizing NFI's equipment." (*Id.* ¶ 28.) As a result, she told Tabb of her decision "not to go forward with Mr. Evans." (*Id.* ¶ 29.) She "shared" with Tabb that NFI would "allow Mr. Evans to work in the Equipment Room for the following two weeks so that he could receive additional pay and have an opportunity to conduct a demonstration with his lighting equipment." (*Id.* ¶ 29.) She alleges that, although he was not authorized to do so, Tabb relayed that decision to Evans the same evening. (*Id.* ¶ 30.) According to Thiagarajah, Evans then quit before ever actually being officially notified that his job was terminated. (*Id.* ¶ 31.) He "demanded and received payment for two weeks without working out the two weeks. He did not return to NFI to work in the equipment room or complete his demonstration." (*Id.*) Finally, she avers that Evans never complained to her "about any hostile treatment from NFI faculty or staff" or "discriminatory treatment related to his disability." (*Id.* ¶ 32.)

For his part, Evans denies that he violated any Code of Conduct, disrespectfully criticized NFI's curriculum, verbally abused anyone, yelled at anyone, engaged in combative conduct, or prevented alumni from using NFI equipment. He alleges that the only criticism he provided was in the written report produced in response to Thiagarajah's specific request that he critique the equipment room and provide recommendations for making it more functional. (Evans Decl. ¶¶ 17, 21, 22, 25, 32–33.) He denies that Thiagarajah had any reasonable basis for believing that he had

engaged in unacceptable conduct and that, if his heated discussion with Perkins violated any Code

of Conduct, then Perkins violated it as well but was not terminated or reprimanded.

Evans denies that he quit. (Evans Decl. ¶ 30.) He alleges that Tabb told him that he had

had a meeting with Thiagarajah and "Ashley from marketing" and that Thiagarajah had instructed

Tabb to tell Evans that he was fired. (Evans Dec. ¶ 29.) Tabb told him that Thiagarajah's stated

reason was that she did not think he was a "good fit." (*Id.* ¶ 30.) Evans also alleges that Thiagarajah

herself then personally told him he was fired but offered him two weeks of severance pay, which

he accepted. (*Id.* ¶ 31; *see also* Tabb Decl. ¶¶ 16.) Tabb explains that, during a meeting with

Thiagarajah and several other people, Thiagarajah stated that she did not believe Evans was a

"good fit for NFI despite his qualifications." (Tabb Decl. ¶ 13.) She "wanted him gone." (*Id.*) She

also told Tabb, however, that she wanted Evans to proceed with his lighting demonstration so that

she could buy his lighting system from him at a discount, as they had discussed when he was hired.

(*Id.* ¶ 14.) Her plan, allegedly, was to inform Evans that he was fired only after she purchased his

lighting system. (*Id.*) Tabb was uncomfortable with that and had known Evans for a long time. He

also felt guilty holding back this information, as it was he who had recommended Evans for the

position. (*Id.* ¶ 15.) As a result, and knowing that Thiagarajah might fire him,[1] Tabb told Evans

about Thiagarajah's decision. Tabb states that, in light of that information, Evans decided not to

do the demonstration or sell his lights to Thiagarajah. (Tabb Decl. ¶ 15.)

## II.  PROCEDURAL HISTORY

Evans initiated this lawsuit in state court, originally asserting only state law claims. By

agreement of the parties, Evans subsequently amended his pleading to include a claim under the

---

[1] She ultimately did not fire Tabb, even though she was displeased with him. (Tabb Decl. ¶ 15.)

ADA, following which NFI removed the case to federal court on the basis of federal question jurisdiction. The Amended Complaint asserts claims for disability discrimination in violation of the TDA and the ADA, as well as claims based on promissory estoppel and false or deceptive hiring representations. (1st Am. Compl., Doc. No. 1-2.)

The defendant has now filed its Motion for Summary Judgment (Doc. No. 14) along with a supporting Memorandum of Law, Statement of Undisputed Material Facts, the Declaration of Prema Thiagarajah, and other evidentiary material (Doc. Nos. 15–17). The plaintiff has filed a Response, Memorandum, Response to the Statement of Undisputed Facts, and the three Declarations referenced above. (Doc. Nos. 18–23.) The defendant filed a Reply. (Doc. No. 28.)[2]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence

---

[2] The defendant's Reply is fifteen pages long, well outside the five-page limit established by Local Rule 7.01(a)(4). The plaintiff did not raise any objection to the Reply based on its length, so the court has considered it in its entirety.

is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

## IV. DISCUSSION

In support of its motion, the defendant argues that (1) the plaintiff's ADA claim must be dismissed as a matter of law, because NFI employed fewer than fifteen employees during the relevant timeframe; (2) the plaintiff's disability discrimination claims under both federal and state law are subject to dismissal, because the plaintiff cannot establish several necessary elements of his *prima facie* case of disability discrimination, including that (a) he is disabled under the ADA, (b) qualified to perform the essential functions of the position for which he was employed, with or without accommodations, or (c) suffered an adverse employment action "because of" his disability; (3) even if the plaintiff could establish a *prima facie* case of discrimination, he cannot show that NFI's proffered legitimate explanation for its action is pretextual; (4) the plaintiff cannot establish "exceptional circumstances" that would permit him to prevail on a promissory estoppel claim raised in the context of an employment dispute; and (5) the plaintiff's claim based on a theory of false and deceptive hiring practices in violation of Tenn. Code Ann. § 50-1-102 fails,

because the plaintiff has not articulated in his pleading what conduct he believes violated the statute.

### A.      Whether NFI Is a "Covered" Employer for Purposes of the ADA

The term "employer" is defined by the ADA to include, with some inapplicable exceptions, "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). Employers who do not meet that definition cannot be liable under the ADA, and this "employee-numerosity requirement" is "an element of a plaintiff's claim for relief" for which the plaintiff bears the burden of proof. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514, 516 (2006). The numerosity requirement for ADA coverage is generally a factual question to be resolved by a jury. *See Arbaugh*, 546 U.S. at 514 ("If satisfaction of an essential element of a claim is at issue, . . . the jury is the proper trier of contested facts." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–151 (2000)).

In this case, the parties have presented conflicting affidavits regarding the number of employees at NFI at the relevant time. The defendant argues that, at the summary judgment stage, the moving party only needs to show that the plaintiff, as the party that bears the burden of proof on a particular element of a claim, cannot satisfy its burden. (Doc. No. 28, at 3 (citing *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).) It argues that the plaintiff's affidavits, standing alone, are not sufficient to prove to a jury that NFI had fifteen or more employees.

The court nonetheless finds that the plaintiff's affidavits regarding his and others' observations regarding the number of employees NFI had when he was employed is sufficient to create a material factual dispute. The plaintiff identifies, by name and position, more than fifteen employees, and includes others who had only recently departed when he was hired. Based on the plaintiff's submissions and the conclusory nature of the defendant's, the court finds that there is a

material factual dispute as to whether NFI employed fifteen or more people during the relevant time period.

The defendant's motion for judgment as a matter of law on the ADA claim on this basis will be denied.[3]

### B. Employment Discrimination Claims

The ADA states: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Ultimately, to prove ADA employment discrimination, a plaintiff must prove that he is disabled and suffered an adverse employment action because of his disability. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019). The Sixth Circuit has held that the "because of" language in the ADA sets a "but for" causation standard. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

In the absence of direct evidence of discrimination, a plaintiff may avoid summary judgment on his ADA discrimination claim by "point[ing] to circumstantial evidence of discrimination under the well-trod *McDonnell Douglas* burden-shifting framework." *Babb*, 942 F.3d at 319 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this standard, the plaintiff must first establish a *prima facie* case of discrimination by showing that:

> (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse

---

[3] There is no dispute that the FNI is a covered employer for purposes of the TDA, which defines employer to include any person "employing eight (8) or more persons within the state." Tenn. Code Ann. § 8-50-103(d).

employment action, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Ferrari*, 826 F.3d at 891. If the plaintiff meets this "not onerous" requirement, the employer must then offer a "legitimate explanation" for its action, which is also rarely an onerous requirement. *Id.* at 894 (quotation marks and citations omitted). After the employer does that, "the burden then shifts back to the [employee], who must introduce evidence showing that the [employer's] proffered explanation is pretextual." *Id.* (quotation omitted). To establish pretext, a plaintiff may show that the defendant's reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003)).[4]

"Because they generally prohibit the same sorts of discriminatory acts, the ADA an[d] the TDA are analyzed utilizing the same standards, except that the TDA does not require that employers make a reasonable accommodation." *Garrett v. CSX Transp., Inc.*, 321 F. Supp. 3d 812, 819 (M.D. Tenn. 2018).

### 1. Whether the Plaintiff Is Disabled Under the ADA and TDA

As set forth above, NFI first argues that the plaintiff cannot establish that he is disabled. The ADA defines "disability" as (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) "being regarded [by

---

[4] An ADA discrimination claim based on a failure to accommodate raises somewhat different legal issues, insofar as it typically depends on direct evidence and is not subject to the *McDonnell Douglas* framework. Although the plaintiff appears now to allege that he requested an "accommodation" in the form of "social grace," he did not state a failure-to-accommodate claim in the Amended Complaint. Rather, his claim is that he suffered an adverse employment action after he requested accommodation for his Asperger's.

one's employer] as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C). The ADA instructs courts to construe the definition of disability "in favor of broad coverage of individuals." *Id.* § 12102(4)(A). "That is because the primary concern of the ADA is 'whether covered entities have complied with their obligations and whether discrimination has occurred,' not whether an individual's impairment is a disability." *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (quoting 29 C.F.R. § 1630.2(j)(1)(iii)).

For purposes of the first form of disability, the plaintiff has the burden of proving that (1) he has a "physical or mental impairment" that (2) "substantially limits" a (3) "major life activity." The ADA provides, as relevant here, the following non-exhaustive list of "major life activities":

> caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C. § 12102(2)(A). The Sixth Circuit also looks to related federal regulations in determining what qualifies as a "major life activity" and does not interpret the term "major" in a strict manner that would create a demanding standard. *Hostettler*, 895 F.3d at 853 (quoting 29 C.F.R. § 1630.2(i)(2)). The regulations define a "substantially limiting" impairment as one that "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii); *see also Hostettler*, 895 F.3d at 854. "An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R § 1630.2(j)(1)(ii).

With regard to the third definition,

> [a]n individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an [adverse employment] action . . . because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

*Id.* § 12102(3)(A).

NFI argues that the plaintiff cannot meet the first definition of disability, because he has not shown that his impairment (Asperger's syndrome) "significantly limit[s] one or more of his major life activities." (Doc. No. 15, at 10.) In support of this argument, it points to Evans's answer to an interrogatory that asks him to "identify the specific diagnosis" upon which his ADA claim is based and the treatment he receives for it. (Doc. No. 15-1, at 2.) Evans responded:

> I have a form of autism called Asperger's Syndrome. I am high functioning and am not in constant treatment. This autism makes me have a neutral face tone at all times and I sometimes struggle to make eye contact. Additionally, I occasionally appear socially awkward in conversation.

(*Id.*) The defendant also argues that the plaintiff has not produced a "record" of an impairment, for purposes of the second definition, and has not shown that the defendant "regarded him" as disabled, for purposes of the third. (Doc. No. 15, at 10.)

The defendant does not argue that Asperger's syndrome, *per se*, is not an "impairment" for purposes of the first element of the first definition of "disability." Rather, NFI contends that, in Evans's case, it does not substantially limit a major life activity. The plaintiff argues that the condition substantially impacts the major life activity of communicating effectively with others and engaging in social interactions. (*Id.* ¶ 14.) He asserts that "social interactions and communications" qualify as major life activities "recognized under the ADA, by Federal Courts, and EEOC regulations alike." (Doc. No. 19, at 15 (citing *Jacobs v. N.C. Administrative Offices of the Courts*, 780 F.3d 562 (4th Cir. 2015); 29 C.F.R. 1630.2(i)(1)(i)). He also contends that NFI "regarded him" as disabled, insofar as Thiagarajah "jumped to a conclusion, based upon Evans's disclosure that he had been diagnosed with Asperger's syndrome, that he was unable to interact with people." (*Id.* at 16.)

Assuming that interacting with others is a major life activity, the court nonetheless finds that Evans has not established that his Asperger's syndrome substantially impaired his activity to engage in such activity. Evans himself states in his Declaration that, while his Asperger's causes him to have neutral facial expressions and renders him unable to tell white lies, often making him appear "too blunt or direct for some social situations" (Evans Decl. ¶ 14), he is nonetheless "able to interact with people without limitation" (Doc. No. 20, at 17 (Resp. to Statement No. 26)). His own Declaration and Tabb's both substantiate that assertion. (*See* Evans Decl. ¶ 38 ("I have long lasting friendships and relationships that show I am able to interact with people."); Tabb Decl. ¶ 9 ("I have known Mr. Evans for over two decades, and he is able to interact with people without limitation.").) Viewing the facts in the light most favorable to the plaintiff, the court finds it clear that Evans's occasional failure to understand social cues, as he and Tabb allege, does not substantially impact his major life activity of interacting with others. *See Weaving v. City of Hillsboro*, 763 F.3d 1106, 1113 (9th Cir. 2014) (distinguishing "'getting along with others' (a normative or evaluative concept) and 'interacting with others' (which is essentially mechanical)" and finding that the plaintiff who was "able to engage in normal social interactions" generally but had interpersonal problems and difficulty getting along with certain peers and subordinates at work did not show that he suffered from an impairment of a major life activity or had an "inability to interact with others" for purposes of the ADA (quoting *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 203 (2d Cir. 2004))); *Weidow v. Scranton Sch. Dist.*, 460 F. App'x 181, 186 (3d Cir. 2012) (finding "interacting with others" to be a major life activity but that the plaintiff failed to establish a substantial limitation in that arena, as she admittedly "always had some friends and socialized with many acquaintances" but simply had difficulty getting along with certain girls in her class); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1131 (10th Cir. 2003) ("[I]n order to

demonstrate a plaintiff's major life activity of interacting with others was substantially affected, a plaintiff must show that his relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary." (quoting *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254–55 (10th Cir. 2001))).[5]

Because the plaintiff has not demonstrated that he was substantially impaired in the major life activity of interacting with others and does not argue that he has presented a "record" of such an impairment, the court must consider whether the defendant nonetheless "regarded" him as disabled, for purposes of the ADA's third definition of "disability." In this case, the plaintiff alleges that he did not have substantial difficulty getting along with others. Instead, he had a single "heated discussion" with a colleague during which the plaintiff allegedly did not act inappropriately. Evans's testimony is that Perkins yelled and behaved inappropriately and insensitively. Thiagarajah heard about this incident from both the plaintiff and Perkins. The plaintiff plausibly alleges that Thiagarajah, knowing that the plaintiff had Asperger's and presented himself as somewhat socially awkward, immediately jumped to the conclusion that Evans, because of his condition, had substantial difficulty interacting with others and that she did not want to deal with someone who had Asperger's syndrome. The circumstantial evidence presented would permit a reasonable jury to infer that Thiagarajah decided that Evans's Asperger's syndrome would make Evans unable to interact appropriately with students, faculty, and community members and, therefore, that he was "disabled" under the definition in 42 U.S.C. § 12102(1)(C).

---

[5] Notably, if the plaintiff *had* established that he had a substantial limitation in his ability to interact with others, then he likely would not be able to establish that he was "otherwise qualified" for his job, for purposes of his *prima facie* case, or that the defendant's reason for firing him was pretextual.

Because there is a material factual dispute as to whether the defendant "regarded" Evans as disabled, it is not entitled to summary judgment on the basis of the "disabled" element of Evans's *prima facie* case.

### 2. *Whether the Plaintiff Was Qualified to Perform Essential Functions*

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Essential functions are "fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1) (2010).

The defendant argues that interacting with students, staff, and alumni and checking equipment in and out were among the essential duties of the job of Equipment Room Manager. The plaintiff does not seriously contest that point, but he does refute the defendant's assertions that he was unable to effectively interact with others and denies that he ever refused to release equipment to a school alumnus. He also denies that he "provoked disagreements with staff, instructors and alumni," was combative, yelled, or otherwise engaged in inappropriate behavior.

As discussed above, the parties present conflicting evidence regarding the plaintiff's interactions with others. The plaintiff has clearly demonstrated the existence of a material factual dispute as to whether he was qualified to perform the essential functions of the job.

### 3. *Whether the Plaintiff Was Terminated Because of His Disability*

The Sixth Circuit has held that the "because of" language in the ADA sets a "but for" causation standard. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). The defendant argues that the plaintiff cannot satisfy this standard, because NFI's "dissatisfaction" with the plaintiff "arose out of [his] abusive and combative conduct, which disrupted the workplace, interfered with

staff's ability to complete their work, and [he] treated alumni and staff disrespectfully." (Doc. No. 15, at 13.) It claims that Evans also "refused to checkout equipment in violation of the purpose of his position" and that his conduct "violated NFI's Code of Conduct and its No-Harassment Policy." (*Id.*)

The plaintiff, as set forth above, disputes all of these allegations. Moreover, he was terminated shortly after notifying Thiagarajah that he had Asperger's syndrome and requesting a modicum of "social grace" in accepting his social limitations arising from that condition. Because there is clearly a material factual dispute as to whether the plaintiff engaged in any of the conduct on which NFI's decision was supposedly based—and a material factual dispute as to whether Thiagarajah actually had reason to believe he had engaged in that conduct—the defendant is not entitled to summary judgment on this basis.

### 4. Whether the Defendant's Proffered Reason Is Pretextual

NFI also argues that, even if the plaintiff satisfies his *prima facie* case, summary judgment is warranted, because it has articulated a legitimate, non-discriminatory reason for its action, which the plaintiff cannot refute. However, NFI's proffered non-discriminatory reason for terminating the plaintiff—his purportedly aggressive and combative conduct—mirrors the reason NFI asserts in support of its claims regarding the plaintiff's ability to perform essential job functions and as to the causal connection between Evans's perceived disability and his termination. Again, there is a material factual dispute as to whether the plaintiff engaged in any of the conduct alleged by Thiagarajah and as to whether she actually had any reason to believe that he had engaged in such conduct.

The defendant is not entitled to summary judgment on the plaintiff's disability discrimination claims under either the ADA or the TDA.

### C.    Promissory Estoppel

Tennessee courts define promissory estoppel as involving "a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance." *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App. 2007) (quoting *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982)). The premise of promissory estoppel is that such a promise "is binding if injustice can be avoided only by enforcement of the promise." *Id.* To succeed on his promissory estoppel claim, Evans must prove "(1) that a promise was made; (2) that the promise was unambiguous and not unenforceably vague; and (3) that [he] reasonably relied upon the promise to [his] detriment." (*Id.* (citing *Rice v. NN, Inc. Ball & Roller Div.*, 210 S.W.3d 536, 544 (Tenn. Ct. App. 2006)). "The key element in finding promissory estoppel is, of course, the promise." *Id.* at 405 (quoting *Amacher v. Brown–Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)). Tennessee courts do not apply the doctrine of promissory estoppel liberally. Rather, "its application is limited to exceptional cases where the circumstances border on actual fraud." *Id.* at 406 (quoting *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006)); *see also Shedd v. Gaylord Entm't Co.*, 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003).

The defendant argues here that the plaintiff has not presented evidence of a specific promise made to him by an authorized representative of NFI or of the existence of exceptional circumstances that would warrant application of the promissory estoppel doctrine in the context of an at-will employment relationship. In response, the plaintiff argues that he was unambiguously promised employment in Tennessee while still living in Wisconsin; that this promise was relayed to him by Tabb, who had the authority to relay Thiagarajah's hiring decisions; and that he relied on this promise to his detriment by moving to Tennessee to accept the job but was "terminated

from NFI just eight days after starting his position for pretextual reasons," causing him to incur substantial financial damages. (Doc. No. 19, at 26.)

The plaintiff's position, essentially, is he was offered a job, accepted the job, and was fired from that job after eight days. The "promise" is that he would have a job—and he apparently had a job for eight days, plus two weeks of severance pay. He has not established conduct "bordering on fraud," *Chavez*, 245 S.W.3d at 406, at the time the offer was made. In light of Tennessee's at-will employment doctrine—pursuant to which "both the employer and the employee are generally permitted . . . to terminate the employment relationship at any time for good cause, bad cause, or no cause," *id.* at 403 (citation omitted)—these circumstances are not sufficiently "exceptional" to support a claim for promissory estoppel. The defendant's Motion for Summary Judgment as to this claim will be granted.

### D.     Tenn. Code Ann. § 50-1-102

The plaintiff also brings a claim for violation of Tenn. Code Ann. § 50-1-102, which states in relevant part:

> It is unlawful for any person to . . . bring workers of any class or calling into this state to work in any type of labor in this state through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment, or as to the existence or nonexistence of a strike or other trouble pending between employer and employees, at the time of or prior to the engagement.

Tenn. Code Ann. § 50-1-102(a)(1). That is, as the language of the statute itself makes clear, for a false or deceptive representation to be actionable under the statute, it must concern: "(1) the kind and character of the work to be done, (2) the amount and character of compensation to be paid for the work, (3) the sanitary or other conditions of the employment, or (4) the existence or nonexistence of a strike or other trouble pending between employer and employees, at the time of or prior to the engagement." *Brewer v. United Wisc. Ins. Co.*, 972 F. Supp. 2d 1044, 1047 (M.D.

Tenn. 2013) (citing Tenn. Code Ann. § 50-1-102(a)(1)). Violation of this provision is a criminal misdemeanor, Tenn. Code Ann. § 50-1-102(b), and any worker damaged by a violation of it may bring a civil cause of action "for all damages that the worker has sustained in consequence of the false or deceptive representations," plus attorney's fees and costs. *Id.* § 50-1-102(c)(1) & (2).

In arguing that it is entitled to summary judgment on this claim, the defendant asserts only that the plaintiff has not articulated in the Amended Complaint what representations he contends were false or deceptive or what conduct qualifies as false advertising or false pretense. (Doc. No. 15, at 18.) The plaintiff argues, in response, that Thiagarajah engaged in "immoral" conduct when she (1) authorized Tabb to extend an employment offer to Evans but, after Evans accepted the offer, advised Tabb that she intended to make Evans go through additional interviews and auditions once he arrived in Nashville; and (2) decided to terminate Evans but to delay telling him of this decision until after she had taken the opportunity to buy his lighting system at a discount rate while he was still employed. He argues that he has, at a minimum, created a material factual dispute as to NFI's liability under § 50-1-102.

The defendant maintains that it never actually offered employment to Evans before he arrived in Tennessee, as a result of which he cannot state a claim based on having been induced by NFI to come to the state for work. That contention is disputed by Evans and Tabb, who clearly allege that Thiagarajah authorized Tabb to extend an employment offer to Evans, which he accepted.

Regardless, the plaintiff still must prove a misrepresentation that falls within one of the four categories identified above. Categories (3) and (4) are clearly inapplicable, as the plaintiff has not raised complaints about the sanitary or other physical conditions of his employment or the existence of a strike. As for category (2), the plaintiff does not allege any facts pertaining to his

compensation. With regard to the first category, "the kind and character of the work to be done," the plaintiff does not point to any affirmative misrepresentation about the type of work he would be doing prior to his arrival, other than that he was hired to fill the roles of both Equipment Room Manager and Cinematography Instructor. His allegations establish that he performed work as Equipment Room Manager from the time he arrived in Nashville. Although it appears that he never actually taught classes at NFI, Evans does not allege that NFI removed that task from his job description after he moved, except by firing him before any scheduled classes actually began. Instead, as set forth above, Evans exchanged emails with Tabb on September 3 about the classes he was expected to teach that fall and their scheduling. His position is that Thiagarajah never told him that he needed to audition in order to teach, and he also does not affirmatively allege that she told him after he arrived in Nashville that he would not be permitted to teach.

In sum, the facts as viewed in the light most favorable to the plaintiff means presuming that he was actually hired to work as both Cinematography Instructor and Equipment Room Manager and that Thiagarajah made up facts after he was fired about his needing to undergo an audition and further interviews for these jobs. Even from that perspective, however, the plaintiff cannot establish any misrepresentations about the "kind and character of the work to be done," except insofar as he was fired. But firing an at-will employee, as long as it was not done for an improper reason (*e.g.*, disability) does not give rise to liability on the part of a Tennessee employer, nor does it support a claim under § 50-1-102.

The defendant is entitled to summary judgment on this claim as well.

## V. CONCLUSION

For the reasons set forth herein, the defendant's Motion for Summary Judgment (Doc. No. 14) will be granted in part and denied in part. Specifically, it will be denied as to the discrimination

claims under the ADA and the TDA and granted as to the plaintiff's promissory estoppel and § 50-1-102 claims.

An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge